UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

PROVIDENCE YOUTH STUDENT :
MOVEMENT (PrYSM) : C.A. 1:19-cv-00378-WES-PAS
    *Plaintiff,* :
 :
V. : *Hearing requested*
 :
JORGE ELORZA, alias, in his indivudal and :
official capacity as Mayor of Providence, :
STEVEN PARÉ, in his individual and official :
capacity as Public Safety Commissioner, :
HUGH CLEMENTS, alias, in his individual :
and official capacity as Chief of Police, and :
the CITY OF PROVIDENCE, by and through :
its Treasurer James Lombardi, III :
    *Defendants*

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S RESPONSE OBJECTING TO DEFENDANTS' MOTION TO DISMISS UNDER RULE 12(b)(1)[1]

### I. INTRODUCTION

Plaintiff Providence Youth Student Movement ("PrYSM") opposes the Motion to Dismiss this civil action for lack of standing by Defendants City of Providence, Jorge Elorza, Steven Paré, and Hugh Clements. The facts that PrYSM alleges in the First Amended Complaint[2] ("Complaint") clearly establish its standing under both organizational and associational theories, as well as third-party standing under the doctrine of *jus tertii*.

---

[1] In the interest of judicial economy and because retention of Defendant Elorza in his individual has no bearing on the relief Plaintiff seeks, Plaintiff confines its briefing herein to the portion of Defendants' Motion seeking to dismiss the Amended Complaint for lack of standing under Fed.R.Civ.P. 12(b)(1).

[2] ECF 5. The factual allegations discussed herein are virtually unaltered from the original complaint (ECF 1) aside from minor corrections, despite the Defendants' characterization of the amendment as an "attempt to rectify" purported deficiencies.

The Complaint sets forth in specific, concrete detail the significant resources the organization has been forced to divert in order to identify and to attempt to cure Defendants' overt violation of Constitutional and statutory law. The historical context provided therein makes it more than reasonable to infer, based on the facts alleged, that the Plaintiff has "alleged such a personal stake in the outcome of the controversy as to warant [its] invocation of federal court jurisdiction." *Havens Realty Corp. v Coleman* et al., 455 U.S. 363, 378 (1982) (internal citations omitted). As a youth organization based in the Southeast Asian refugee community, PrYSM's nomenclature and organizational structure regarding "membership" may not mirror the traditional lexicon of trade associations, national advocacy organizations, or labor unions. To dismiss this action on that basis would punish PrYSM's constituents for helping to create the the rich diversity that shapes even organizational structures in the City of Providence and State of Rhode Island, even though the United States Supreme Court has found associational standing for a Plaintiff who was "not a traditional voluntary membership organization" and had "no members at all." *Hunt v.. Washington State Apple Advertising Comm.*, 432 U.S. 333, 342 (1977).

Were these solid constitutional pathways for PrYSM to assert standing not enough, the doctrine of *jus tertii* may also be properly invoked here. The facts alleged in the Complaint are sufficient to overcome prudential barriers, and to allow third-party standing based on the deep relationship between PrYSM and its constituency, the difficulties those constituents face in bringing their own challenge to the alleged constitutional violations, and the efficacy of PrYSM as a proponent of those constituents' rights. *See generally Singleton v. Wulff*, 428 U.S. 106 (1976); *Playboy Enterprises, Inc.*, et al., *v. Public Service Comm. of Puerto Rico,* et al. 906 F.2d 25 (1st Cir. 1990).

## II. FACTUAL BACKGROUND

Providence Youth Student Movement is a youth organization based in Providence's Southeas Asian community. Compl. ¶1. Its mission is to mobilize queer Southeast Asian youth and their families to build grassroots power and to organize collectively toward a vision of a Southeast Asian community free from state, street, and interpersonal violence. It is incorporated under Rhode Island law as a non-profit. *Id.* Since PrYSM began in 2002 Southeast Asian youth and their families turned to PrYSM to address the widespread and officially clandestine practice by Providence Police of adding Southeast Asian community members to its so-called "gang database." Compl. ¶¶12-15.

With the passage of a municipal ordinance on June 1, 2017 under PrYSM's leadership, it became illegal for the Police to include "association" as a factor in designating people as gang members. Compl. ¶¶19-26. Much to PrYSM's dismay and as soon as the law took effect, the City blatantly violated not only the local ordinance, but the United States Constitution as well by promulgating a policy that relied extensively on the use of association to designate people as supposed "gang members." Compl. ¶¶27, 39. PrYSM was then obligated to engage in a litany of activity over the next eighteen months to demand, cajole, and persuade the City to follow the law, along with research and investigation to monitor its compliance, or more accurately the lack thereof. Compl. ¶¶28-38.

Two instances of illegal "gang profiling" of Southeast Asian community members are described in the Complaint, including one gentleman who was refused a concealed carry permit because of his inclusion on the database, and an eleven-year old child and her older brother who were stopped without probable cause by members of the re-styled gang unit, who made

them stand at the side of the road in the cold while police illegally searched the vehicle, making cryptic references to the young man's "blue" car, and (Toronto) Blue Jays shirt. Compl. ¶ ¶42, 43.

### III. STANDARD

**a. The Standard for a Motion to Dismiss for Lack of Standing is Conceptually Similar to a Motion to Dismiss for Failure to State a Claim.**

When a claim is challenged under Rule 12(b)(6), the court must presume that all allegations set forth in the complaint are true, resolve all doubts in favor of the plaintiff and view the complaint in the light most favorable to the non-moving party. *Albright v. Oliver*, 510 U.S. 266, 267 (1994); *Figueroa v. Rivera*, 147 F.3d 77 (1st Cir. 1998). All inferences must be drawn in favor of the non-moving party. *Harper v. Cserr*, 544 F.2d 1121, 1122 (1st Cir. 1976). A complaint may not be dismissed for failure to state a claim unless "the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture." *SEC v. Tambone,* 597 F.3d 436, 442 (1st Cir.2010) (en banc). While a court is not required to *assume* facts*, it must draw reasonable inferences in making the foregoing determination*—it must "connect the dots." The question is merely "whether the complaint states a claim to relief that is plausible on its face, accepting the plaintiff's factual allegations and drawing all reasonable inferences in the plaintiff's favor." *Cooper v. Charter Commc'ns Entertainments I, LLC*, 760 F.3d 103, 106 (1st Cir. 2014) (internal citations omitted). [3]

---

[3] Here Plaintiff describes standards articulated in response to motions under Fed.R.Civ.P. 12(b)(6), as described in *U.S. v. AVX Corp.,* 92 F.2d 108, n. 6: "Because the pending motions seek dismissal on the basis of the pleadings, they are highly analogous to motions brought under Fed.R.Civ.P. 12(b). Courts have often treated motions to dismiss for want of standing as motions to dismiss for failure to state a claim, thus bringing them under the rubric of Rule 12(b)(6). (followed by string cite).

Plaintiff concurs with Defendants' position that when a question of standing is raised at the pleading stage that level of specificity is required as to the facts establishing standing, and refines that statement slightly by adding that it is the *type* of facts needed, not how they are analyzed that different from a Motion to Dismiss, *See U.S. v. AVX Corp.*, 962 F.2d 108. "The complainant must set forth reasonably definite factual allegations, either direct or inferential, regarding each material element needed to sustain standing. *Id.* at 115. (Citing *Munoz-Mendoza v. Pierce*, 711 F.2d 421 at 425 (1st Cir. 1983) ("Where 'injury' and 'cause' are not obvious, the plaintiff must plead their existence in his complaint with a fair degree of specificity.")).

b.  **A Plaintiff May Establish Standing Under Article III of the Constitution By Alleging Injury To Itself or To Its Members.**

"[T]he standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin*, 422 U.S. 490, 498-99, (1975) (citing *Baker v. Carr*, 369 U.S. 186, 24 (1962)). This personal stake can also be described as a "distinct and palpable injury." *Id.,* at 501. For an organization that seeks to be a Plaintiff, the fundamental concept of the Article III minima injury remains: "There is no question that an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Id.* at 511. In that context, a plaintiff must allege "(1) an actual or threatened injury suffered as a result of the putatively illegal conduct of the defendants, (2) that its injury 'fairly can be traced to the challenged action,' and (3) that this injury is likely to find redress in a favorable decision." *Playboy Ent.* 906 F.2d at 36 (citing *Valley Forge Christian College v. Americans United*, 454 U.S. 464, 472 (1982)).

An organization may also establish standing by asserting the claims of its constituency. *Hunt* 432 U.S. at 344. "Moreover, in attempting to secure relief from injury to itself, the association may assert the rights of its members, at least so long as the challenged infractions adversely affect its members' associational ties." The Supreme Court is clear that an association need only allege that one member or more suffers "immediate or threatened injury as a result of the challenged action" as long as it would "make out a justiciable case had the members themselves brought suit. *Warth*, 422 U.S. at 511.

c.  **Prudential Restrictions Against Third-Party Standing May Be Relaxed**

The doctrine of *jus tertii* provides a means for the Court to go beyond the judicially created obstacles to a plaintiff litigating claims that affect a third party. The Supreme Court looks to two factual elements when evaluating whether these restrictions may be set aside. "The first is the relationship of the litigant to the right he seeks to assert." *Singleton v. Wulff*, 428 U.S. 106, 114 (1976). The right must be "inextricably bound up with the activity the litigant wishes to pursue." *Id.* The second factual element is "the ability of the third party to assert his own right." *Id.* at 115-16. When assessing that capacity among women seeking abortions, the *Singleton* court inferred that a woman might be "chilled" from litigating her own interests "by a desire to protect the very privacy of her decision from the publicity of a court suit." *Id.* at 117. A further examples is the right to anonymity that members of an organization might desire. *NAACP v. Alabama*, 357 U.S. 449 (1958) (cited in *Wulff,* 428 U.S. at 116).

IV.  ANALYSIS

a.  **PrYSM Has Organizational Standing.**

PrYSM's Complaint establishes Article III standing under both organizational and asso-

ciational theories. The injury to PrYSM is much more clearly defined than that faced by the plaintiff HOME in *Havens Realty,* 455 U.S. at 379. There, the court summarized that Plaintiff HOME "has had to devote significant resources to identify and counteract defendant's [*sic*] racially discriminatory steering practices." In the instant case, Defendants seek to minimize or elide the burden their actions have caused PrYSM, dismissing PrYSM's complex and laborious public watchdog and community education functions as mere "passionate interest, advocacy, and lobbying."

The facts alleged tell a different story, namely that the activity Defendants have caused PrYSM to undertake over an eighteen month period merely to seek *compliance* with a clear legislative mandate represents an enormous undertaking for any organization. Each activity described in paragraphs twenty-seven (27) through thirty-eight (38) of the complaint entails time by multiple staff and volunteer members. The depth of research, analysis, writing, editing, phone calling, emailing, and reading alone can be reasonably inferred to require dozens of hours of staff and volunteer time. In a community-based organization such as PrYSM, important activities such as protecting the community's constitutional rights require collective discussion, community outreach, and decision-making, which divert even more scarce person-hours into activity that would never have been necessary had Defendants simply obeyed the Constitution and relevant laws.

The above calculus does not even touch on the devaluation Defendants' transgressions implicate for at least nine years of effort PrYSM spent working on a solution to Defendants' unconstitutional use of association in their gang database. Compl. ¶¶16-26. The labor and material resources expended in passing this historic, comprehensive legislation constitute much

more than "[a] mere interest in an event." (ECF 9-1 at 7). Dozens of community members spending dozens of hours over a two-year period to design a policy (Compl. ¶¶19-20), testimonies, analysis, and the gathering of community input (Compl. ¶22), engagement of hundreds of community members in civic activity (Compl. ¶22), as well as facilitating the participation of forty-five (45) local businesses, faith groups, and organizations (Compl. ¶23) requires significant effort.

It is a reasonable inference that a non-profit organization, especially a community-based youth group, will depend on donations to carry out its work. It is also reasonable to infer that when a group has a major accomplishment such as passage of the Community Safety Act, potential donors, both institutional and individual, will respond positively, increasing the material support for the organization's work. When that accomplishment becomes merely ornamental, as the Defendants would render the constitutional protections of the gang database provisions of the ordinance, then it is also reasonable to infer that supporters may well be discouraged. Clearly, the concrete harm done to PrYSM has more than "perceptibly impaired" its ability to carry out its work, just as the plaintiff HOME experienced. *Havens* 455 U.S. at 379.

**b.     PrYSM Has Associational Standing.**

The youth and their families who are at the core of PrYSM's constituency (Compl. ¶1, 13) are at the core of the negative impact of Defendants' transgressions. "Geographic concentration, large extended families, and isolation from other racial and ethnic groups guaranteed that by the late 1990's, almost every Southeast Asian person in Providence knew someone who was or had been a member of a gang at some point." Compl. ¶12. This cultural and historical reality requires a lens somewhat different than one applied to a trade association, labor union,

or other typical advocacy organization. The Complaint does reference, without defining, "community members" (¶13), "youth leaders and staff" (¶16), "PrYSM youth" (¶¶16, 19), and illustrates their participation in the organization. More relevant to the question of associational standing, the Complaint describes the constituency's historical and current risk of being named as "gang members" due to their racial identity and association. Comp. ¶¶11-18.

IV. CONCLUSION

PrYSM is directly harmed by Defendants' refusal to respect the Constitution and statutory prohibitions on its use of association to designate people as "gang members." The Plaintiff meets Article III standing requirements under both organizational and associational approaches, and also merits the status of prudential third-party standing.

**WHEREFORE**, Plaintiff respectfully requests that Defendants' Motion to Dismiss be denied.

>Plaintiff
>Providence Youth Student Movement
>By its Attorney:
>
>/s/ Shannah Kurland _____
>Shannah Kurland, Esq. R.I. Bar #9186
>149 Lenox Avenue
>Providence, RI 02907
>Tel. (401)439-0518
>skurland.esq@gmail.com

**CERTIFICATE OF SERVICE**

I hereby certify that I have filed the within memorandum with the United States District Court this 31st day of October, 2019 that a copy is available for viewing and downloading via the ECF system to the following attorneys of record for Defendants:

Steven B. Nelson, Esq.                          Sharon G. Garner, Esq.
snelson@providenceri.gov                sgarner@providenceri.gov

/s/ Shannah Kurland _____